IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


SANDRA L. BAER, as Administratrix of          )
the Estate of Ralph Martin,                   )
        Plaintiff,                             )
                                               )
        vs.                                    )     Civil Action No. 07-473
                                               )     Judge Conti
UNION SECURITY LIFE INSURANCE                 )     Magistrate Judge Mitchell
COMPANY,                                       )
        Defendant.                             )


REPORT AND RECOMMENDATION

I.      Recommendation

      It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant (Docket No. 11) be granted.

II.     Report

      Plaintiff, Sandra L. Baer, as administratrix of the estate of Ralph Martin, deceased

("Martin"), brings this action against Defendant, Union Security Life Insurance Company

("Union Security"), arising out of Union Security's denial of coverage under a mortgage

insurance policy issued to Martin.  Plaintiff alleges that Defendant breached its contractual duty

to pay the mortgage balance upon Martin's death, that it acted negligently, committed fraud and

deceit and violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73

P.S. §§ 201.1 to 201.9.3 (UTPCPL).  Defendant maintains that Martin voided his policy when he

answered "no" on his insurance application in response to the question of whether, in the

previous five years, he had, had been medically advised that he had, or had been treated for heart

disease.

Presently before this Court for disposition is a motion for summary judgment, brought by the Defendant. For the reasons that follow, the motion should be granted.

Facts

On August 14, 2003, Ralph Martin applied for credit life insurance in conjunction with a loan from National City Bank. The purpose of the policy was to secure a mortgage taken by Martin on his home, in the amount of $84,000.00. (Compl. ¶¶ 6-7.)[1] The application outlined for Martin that insurance was "optional" and was not required on the loan. (Marcucci Dep. Ex. 28.)[2] Additionally, the application informed Martin that to apply for the insurance, he had to truthfully answer four questions and that "[u]ntruthful answers may result in denial of claims." Id. The application contained a health question – question 2 – which asked:

> In the past 5 years, have you had, been medically advised that you have or been treated for any of the following: heart disease, cancer, except for non-invasive skin cancer, diseases of the brain, kidney, liver or lung, AIDS, ARC (AIDS Related Complex), or any disorder of the immune system?

Id.

Martin checked the box indicating "NO" to the question and signed the application. Above his signature, Martin certified:

> I hereby state that the information given in this Application is correct to the best of my knowledge and belief. This Application is given in connection with insurance requested on my debt. I understand that this Application is the basis for and a part of any insurance that may be provided for me. Satisfactory evidence of insurability means that I have truthfully answered "no" to the above questions. . . . Untruthful answers may result in denial of claims.

Id. Upon receipt of the application, a Union Security Certificate of Insurance (the "Certificate")

---

[1]     Docket No. 1.

[2]     Def.'s App. (Docket No. 11) Ex. A.

was delivered to Martin.  (Answer ¶ 6.)[3]

On May 25, 2005, Martin died.  (Compl. ¶ 9.)  On July 7, 2005, Sandra L. Baer was made the administratrix of his estate by virtue of Letters of Administration that were granted in Washington County by the Register of Wills at No. 63-05-0739.  (Compl. ¶ 1 & Ex. 1.) Thereafter, she made a request for insurance proceeds under the Certificate.  (Baer Dep. Ex. 29.)[4]

On November 4, 2005, Union Security sent a letter to Dr. Peter A. Martina – a licensed osteopathic physician who was Martin's primary-care physician from at least August 15, 1994 until at least July 23, 2004 – seeking Martin's medical records.  (Martina Dep. at 9, 12, 42;[5] Baer Dep. Ex. 35.)[6]  According to Martin's medical records, Dr. Martina had treated him for the diagnosis of coronary artery disease on several occasions between January 15, 1999 and November 5, 2002.  (Baer Dep. Ex. 44.)[7]

On March 3, 2006, Union Security also sent a letter to the Washington Hospital Family Practice, the parent of Dr. Martina's Canonsburg Family Practice.  Washington Hospital Family Practice was asked if it treated Martin for heart disease from August 14, 1998 to August 14, 2003 and it responded that it had.  (Baer Dep. Ex. 49.)[8]

On August 10, 2006, Union Security denied the request for insurance proceeds under the

---

[3]     Docket No. 4.

[4]     Def.'s App. Ex. B.

[5]     Def.'s App. Ex. C.

[6]     Def.'s App. Ex. D.

[7]     Def.'s App. Ex. E.

[8]     Def.'s App. Ex. F.

Certificate. (Compl. ¶ 20 & Ex. 4.) Plaintiff's counsel wrote to Union Security on August 28, 2006 to protest this decision (Compl. ¶ 21 & Ex. 5), but Union Security did not respond.

Plaintiff indicates that Martin paid all premiums in full during his lifetime, that the home sold on October 26, 2005 with a balance due on the mortgage in the amount of $83,517.25 and that Union Security's refusal to pay the proceeds of the policy forced her to pay of the mortgage out of estate assets in order to convey clear title to the purchasers of the house. (Compl. ¶¶ 10, 12-14.) This suit ensued.

Martin's Medical Background

On March 19, 1992, Martin received a left heart cardiac catheterization at Mercy Hospital in Pittsburgh, Pennsylvania. (Marcucci Dep. at 22.)[9] The procedure revealed that Martin's left circumflex artery was completely blocked. (Marcucci Dep. at 25; Marcucci Dep. Exs. 3-6.[10]) Following the procedure, Martin was treated with medication, including Cardizem, which is used for the treatment of heart disease. (Marcucci Dep. at 15-16.)

Martin was evaluated by Dr. Peter A. Martina, a licensed osteopathic physician who was Martin's primary-care physician from at least August 15, 1994 until at least July 23, 2004. (Martina Dep. at 9, 12, 42.) Following an abnormal stress test conducted on July 20, 1994, Dr. Martina referred Martin to Dr. James W. Marcucci – a cardiovascular specialist who is board-certified in internal medicine, cardiovascular diseases, interventional cardiology, and nuclear cardiology. From August 15, 1994 to August 28, 2000, Dr. Marcucci served as Martin's

---

[9]     Def.'s App. Ex. G.

[10]    Def.'s App. Ex. H.

cardiologist.  (Martina Dep. at 11; Marcucci Dep. at 7; Marcucci Dep. Ex 1.[11])  Dr. Marcucci

treated Martin for coronary artery disease – a type of heart disease – with both office visits and

medication.  (Marcucci Dep. at 37-38, 42-43, 48, 53, 55-56, 71-72; Marcucci Dep. Ex. 1.)

Martin first visited Dr. Marcucci on August 15, 1994 following the abnormal stress test

conducted on July 20, 1994.  (Marcucci Dep. at 29.)  Martin's July 20, 1994 stress test produced

evidence of a possible prior heart attack.  (Marcucci Dep. at 35.)  An electrocardiogram

performed on Martin on August 15, 1994 also contained evidence of a previous heart attack.

(Marcucci Dep. at 36; Martina Dep. at 17.)

Following the August 15, 1994 appointment with Dr. Marcucci, Martin continued to be

treated with Cardizem and Lopid, a drug that is used to treat high cholesterol and high

triglycerides, both of which are associated with increased risk of heart attacks and cardiac

morbidity.  (Marcucci Dep. at 38-39.)

Martin next visited Dr. Marcucci on August 4, 1997.  (Marcucci Dep. at 41.)  During this

visit, Dr. Marcucci discussed lab testing that was performed on July 6, 1997 while Martin was in

the hospital.  (Marcucci Dep. at 42.)  Because Martin's lab results produced a cholesterol reading

of 248, HDL of 45, LDL of 184, and triglycerides of 95, he was placed on Lipitor, a statin drug to

lower cholesterol, in addition to his continued use of Cardizem.  (Marcucci Dep. at 43; Marcucci

Dep. Ex. 12.[12])

On February 9, 1999, Martin submitted to another electrocardiogram, which again

showed evidence of a previous heart attack. (Marcucci Dep. at 44-46; Martina Dep. at 22.)

---

[11]     Def.'s App. Ex. I.

[12]     Def.'s App. Ex. J.

During an office visit to Dr. Marcucci on March 16, 1999, Dr. Marcucci discussed Martin's heart disease with him and continued his then-current treatment for heart disease. (Marcucci Dep. at 47-48.)

On August 31, 1999, Martin telephoned Dr. Marcucci's office complaining of increased chest-burning and shortness of breath on exertion. (Marcucci Dep. at 49.) As a result of Martin's telephone call, an office visit was scheduled with Dr. Marcucci for September 13, 1999, and Martin was instructed to go to the emergency room if his symptoms increased. (Marcucci Dep. at 50.) During the September 1999 office visit, Dr. Marcucci discussed Martin's heart disease with him and continued his then-current treatment for heart disease. (Marcucci Dep. at 54.)

In January 2000, Martin visited Dr. Gregory G. Machiko, a gastroenterologist, complaining of bleeding from the rectum. (Martina Dep. at 11.) While completing a patient identification form for Dr. Machiko, Martin was asked to "place an (x) next to any of the following problems that you have right now" and Martin placed an "x" next to "heart trouble." (Def.'s App. Ex. K.)

Martin next visited Dr. Marcucci on July 25, 2000, again complaining of increased shortness of breath on exertion. (Marcucci Dep. at 57-58.) Martin's wife, who was with him at the appointment, told Dr. Marcucci that Martin was unable to walk any significant distances without becoming totally short of breath and requiring a rest. (Marcucci Dep. at 60.) During this office visit, Martin submitted to another electrocardiogram, which again showed evidence of a previous heart attack. (Marcucci Dep. at 57-58.)

Two days after the July 25, 2000 examination, Martin submitted to an echocardiogram.

(Marcucci Dep. at 61.)  The echocardiogram indicated that Martin possessed an enlarged heart and weakness and mild scarring in one area of the heart.  (Marcucci Dep. at 62; Martina Dep. at 31.)

On July 31, 2000, Martin submitted to a stress test and nuclear scan.  (Marcucci Dep. at 63.)  The results of the July 31, 2000 stress test and nuclear scan were "consistent with the documented total occlusion of the dominant left circumflex coronary artery"and weakness of the heart muscle.  (Marcucci Dep. at 65-66; Martina Dep. at 29-30.)

Martin returned to Dr. Marcucci's office on August 28, 2000 to discuss the results of these tests.  (Marcucci Dep. at 69.)  During this office visit, Dr. Marcucci discussed Martin's heart disease with him, continued his then-current treatment for heart disease, and advised him that if he experienced increased shortness of breath or chest pain that he would require another cardiac catheterization.  He did not order another catheterization at that time because Martin's nuclear scan was unchanged from 1994.  (Marcucci Dep. at 70-71.)  Martin continued to take Cardizem to treat heart disease after August 28, 2000 until the time of his death.  (Marcucci Dep. Ex. 2;[13] Martina Dep. Ex. 11.[14])

In October 2002, Dr. Martina referred Martin to Dr. Finn for an umbilical hernia repair. (Martina Dep. at 36.)  On October 24, 2002, Dr. Finn performed a required preoperative chest x-ray on Martin which displayed thickening or plaque build-up of the aortic artery and evidence

---

[13]    Def.'s App. Ex. L.

[14]    Def.'s App. Ex. M.

of an enlarged heart. (Martina Dep. at 38-40; Martina Dep. Ex. 8.[15])

On July 23, 2004, Martin visited Dr. Martina's office because he was experiencing problems with an umbilical hernia and an inguinal hernia. (Martina Dep. at 43.) Dr. Martina referred Martin to Dr. Brent Angott, a general surgeon at Washington Hospital. On August 3, 2004, in Martin's "Preop History & Physical," Dr. Angott noted that Martin's "past medical history is significant for coronary artery disease." (Def.'s App. Ex. O.)

On February 23, 2005, Martin went to Southwest Gastroenterology Associates for an office visit. On a Review of Symptoms form, he checked "no" for both "heart disease" and "high blood pressure." (Pl.'s App. at 31.)[16]

On March 25, 2005, Martin went to the emergency room complaining of chest pain. (Martina Dep. at 43-44; Martina Dep. Ex. 9.[17]) While in the emergency room, Martin received a chest x-ray which evidenced an enlarged heart. (Martina Dep. at 45; Martina Dep. Ex. 9.)

On May 25, 2005, Martin died. Upon Martin's death, Dr. Martina signed Martin's certificate of death. Dr. Martina determined that Martin's causes of death were "acute myocardial infarction, a heart attack, which was due to coronary artery disease, a blocked artery." (Martina Dep. at 48; Martina Dep. Ex. 12.[18]) On Martin's death certificate, Dr. Martina stated that the interval between onset and death for Martin's coronary artery disease was "Years" because "[h]e had known coronary artery disease dating back into the 90's." (Martina Dep. at

---

[15]     Def.'s App. Ex. N.

[16]     Docket No. 14.

[17]     Def.'s App. Ex. P.

[18]     Def.'s App. Ex. Q.

49; Martina Dep. Ex. 12.)

Procedural History

Plaintiff filed this action on April 10, 2007. Jurisdiction is based on diversity of citizenship in that Plaintiff is a citizen of Pennsylvania, Defendant is an insurance company incorporated in the state of Delaware with its principal place of business in Atlanta, Georgia and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Compl. ¶¶ 2-4; Answer ¶¶ 3-4.) Count I alleges a claim for breach of contract. Count II alleges a claim for negligence. Count III alleges a claim of fraud and deceit. Count IV alleges violations of the UTPCPL.

On May 30, 2008, Defendant filed a motion for summary judgment.

Standard of Review for Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Union Security argues that: 1) Martin made a material misrepresentation on the application for the policy and thereby voided it, so Plaintiff's breach of contract claim fails; 2) the negligence claim fails because Union Security owed Martin no duty under Pennsylvania law – rather it was his duty to be truthful on his application – and it is also barred by the gist of the action doctrine; 3) Union Security made no representations, and therefore the claim for fraud and deceit fails and it is also barred by the gist of the action doctrine; and 4) no facts exist to support the UTPCPL claim.

Plaintiff responds that there are genuine issues of fact as to what Martin's condition was and what he understood and that the phrase "medically advised" is ambiguous and thus it cannot be said as a matter of law that he made a fraudulent misrepresentation on his application. Plaintiff has not responded to Defendant's arguments concerning Counts II-IV.

Count I: Breach of Contract

In Count I, Plaintiff alleges that Defendant breached its contractual responsibilities by denying the claim for payment of the policy proceeds. Defendant moves for summary judgment on the ground that Martin made a fraudulent misrepresentation on his application and thereby voided the policy.

Under Pennsylvania law, an insurance policy is void for misrepresentation when the insurer establishes three elements: 1) that the representation was false; 2) that the insured knew that the representation was false when made or made it in bad faith; and 3) that the representation

was material to the risk being insured. <u>New York Life Ins. Co. v. Johnson</u>, 923 F.2d 279, 281 (3d Cir. 1991) (citations omitted). <u>See also</u> <u>Tudor Ins. Co. v. Township of Stowe</u>, 697 A.2d 1010, 1017 (Pa. Super. 1997). In this case, Plaintiff has not challenged Defendant's assertion that the representation was material to the risk being insured. However, she contends that whether Martin's answer on the application was false and whether he knew it was false when made or made it in bad faith present genuine issues of material fact precluding the entry of summary judgment.

<u>Falsity</u>

Plaintiff argues that Martin's answer an the application was not false because the evidence indicates only that he had a cardiac catheterization in 1992 and that he was occasionally tested thereafter and took medication until his death. She maintains that his condition never deteriorated and that he was taking his prescribed medication as a preventive measure only.

The Pennsylvania Supreme Court has held that:

> If the statements in fact were false and the insured knew that they were false when he made them, this constituted fraud, since a statement known to be false when it is made is presumptively fraudulent: <u>Kizrian v. United States Life Ins. Co.</u>, 383 Pa. 515, 119 A.2d 47 (1956). If such falsity and the requisite bad faith affirmatively appear from (a) competent and uncontradicted documentary evidence, such as hospital records, admissions in the pleadings or proofs of death or (b) the uncontradicted testimony of plaintiff's own witnesses, a verdict may be directed for the insurer, <u>Kizrian v. United States Life Ins. Co.</u>, <u>supra</u>.

<u>Shafer v. John Hancock Mut. Life Ins. Co.</u>, 189 A.2d 234, 236 (Pa. 1963). In <u>Shafer</u>, when the insured answered "no" to many questions about his prior medical history (whether he had had electrocardiograms, been told he had increased blood pressure, been treated or examined by a physician within the past five years) when in fact all of them applied, the court indicated that the judgment was properly entered in favor of the insurer. Thus, the Court should examine the

medical records and testimony to determine whether the statement was false.

During the disclosure period, namely from August 1998 to August 2003, the medical evidence establishes the following: 1) Martin had two electrocardiograms which showed evidence of a possible previous heart attack; 2) Martin called Dr. Marcucci's office twice complaining of increased chest burning and shortness of breath on exertion; 3) Martin continued to take medication for heart disease; 4) Martin had an echocardiogram which indicated that he possessed an enlarged heart and weakness and mild scarring in an area of the heart; and 5) Martin had a stress test and a nuclear scan, which were "consistent with the documented total occlusion of the dominant left circumflex coronary artery."

Plaintiff does not dispute this evidence, but rather argues only that Martin's condition did not deteriorate. She cites the following evidence: 1) Dr. Martina's observation that Martin's test results from the February 1999 electrocardiogram did not constitute an abnormal finding (Martina Dep. at 22); 2) Dr. Martina's observation that Martin's October 2002 x-ray had "no acute process or change" from a September 2000 x-ray (Martina Dep. at 40); 3) Dr. Marcucci's August 4, 1997 indication that Martin was "asymptomatic" at that time (Pl.'s App. at 25); 4) the notation on Martin's July 13, 1997 admission to Canonsburg General Hospital that he had no chest discomfort since his catherization in 1992 (Pl.'s App. at 29); 5) Dr. Marcucci's note that an exam in 2000 was "fairly unremarkable" (Marcucci Dep. at 60); and 6) the nuclear stress test in August 2000 was unchanged from the one taken in 1994 and therefore no repeat catheterization was required at that time (Marcucci Dep. at 70).

However, that is not the question. Dr. Marcucci testified as follows:

Q: In the period of August 14, of 1998 to August of 2000, the last time you saw him, did Mr. Martin have heart disease?

A: He did have heart disease.

Q: And did you treat Mr. Martin for heart disease?

A: I did treat him for such.

Q: And during that time period did you advise Mr. Martin that he had heart disease?

A: I'm sure I advised him that he had heart disease.

(Marcucci Dep. at 72.)  As noted above, Dr. Martina signed Martin's certificate of death, indicating that Martin's causes of death were "acute myocardial infarction, a heart attack, which was due to coronary artery disease, a blocked artery."  (Martina Dep. at 48.)  He further stated that the interval between onset and death for Martin's coronary artery disease was "Years" because "[h]e had known coronary artery disease dating back into the 90's."  (Martina Dep. at 49; Martina Dep. Ex. 12.)

All of this evidence demonstrates that Martin had heart disease and was being treated for it.  That Martin's condition did not deteriorate during the relevant time period does not change these facts.

Knowledge of Falsity

Plaintiff argues that the application asked Martin "only whether he had been 'medically advised' of his health issues."  (Pl.'s Opp'n at 6.)[19]  This is inaccurate.  The question was in the disjunctive.  It asked whether, in the five years preceding: 1) he had heart disease; or 2) he had been medically advised that he had heart disease; or 3) he had been treated for heart disease.  Thus, even accepting Plaintiff's argument that the phrase "medically advised" is ambiguous, the

---

[19]     Docket No. 14.

fact remains that if Martin had heart disease or was treated for it, he should have responded yes

to the question. As the evidence cited above illustrates, there is no dispute that Martin had heart

disease and was being treated for it. In addition, Martin himself informed one of his doctors that

he had "heart trouble." (Def.'s App. Ex. K.)[20] Finally, Dr. Marcucci testified that he was sure he

had advised Martin that he had heart disease. Thus, the evidence establishes that Martin knew he

had heart disease.

> In addition, under Pennsylvania law, where it is established
>
> by uncontradicted documentary evidence that the insured had consulted physicians so frequently, or undergone medical or surgical treatment so recently, or of such a serious nature, that a person of ordinary intelligence could not have forgotten these incidents in answering a direct and pointed question in an application for insurance, bad faith may be inferred as a matter of law if the insured denies in his answer than any physician has been consulted, or any medical or surgical treatment has been received during the period of inquiry.

Piccinini v. Teachers Protective Mut. Life Ins. Co., 463 A.2d 1017, 1024 (Pa. Super. 1983)

(citations omitted). In that case, when the insured answered "no" to questions on application

about whether he had arthritis and sacroiliac disease but uncontroverted medical evidence

established that he had both these conditions, the policy was properly voided. See also Shafer,

189 A.2d at 237 (insured was "bound to know and to remembers substantially all of the medical

treatment, hospitalization, x-rays and electrocardiograms"); Flick v. Union Sec. Life Ins. Co.,

1996 WL 251873, at *4 (E.D. Pa. May 7, 1996) (plaintiff claimed that insured did not know he

had received treatment for angina, but uncontradicted medical evidence established that he had

received recent and extensive treatment, so his knowledge was inferred as a matter of law).

---

[20]     Plaintiff argues that on another form Martin indicated that he did not consider himself to have either heart disease or high blood pressure. (Pl.'s App. at 31.) However, that form was completed on February 23, 2005, after the disclosure period.

Martin's bad faith may be inferred from the evidence and found as a matter of law.

Materiality

"The question of materiality is generally considered one of fact and law, but if the facts misrepresented are so obviously important that 'reasonable minds cannot differ on the question of materiality,' then the question becomes one of law that the court can decide at the summary judgment stage." Parasco v. Pacific Indemnity Co., 920 F. Supp. 647, 654 (E.D. Pa. 1996) (quoting Gould v. American- Hawaiian S.S. Co., 535 F.2d 761, 771 (3d Cir. 1976)). The Pennsylvania Supreme Court has held that:

> Inquiries in applications for life insurance as to prior medical attendance and hospitalization are material to the risk and fraudulent answers thereto must permit the insurer to avoid the policy, not only because of a failure to report the exact nature of the previous illness, but also because of a failure to furnish information from which the insurer could protect itself through further investigations. Reeder v. Metropolitan Life Ins. Co., 340 Pa. 503, 17 A.2d 879 (1941); Prevete v. Metropolitan Life Ins. Co., 343 Pa. 365, 22 A.2d 691 (1941).

Shafer, 189 A.2d at 236. In Shafer, when the insured answered "no" to many questions about his prior medical history (whether he had had electrocardiograms, been told he had increased blood pressure, been treated or examined by a physician within the past five years) when in fact all of them applied, the court indicated that the judgment was properly entered in favor of the insurer, even though the insured died in an auto accident. See also McCloskey v. New York Life Ins. Co., 436 A.2d 690 (Pa. Super. 1981) (when insured answered "no" to questions about whether he had diabetes and heart attack but record showed he had both these conditions, policy was properly voided).

As noted above, Plaintiff has not challenged Union Security's assertion that Martin's representation was material to the policy and the cases cited above demonstrate that a

misrepresentation of that nature on an application for life insurance is material to the issuance of a policy. Moreover, the application informed Martin that "untruthful answers may result in denial of claims." Thus, Union Security clearly highlighted its reliance upon truthful answers directly on the application.

Because Defendant has demonstrated that Martin knowingly made a false statement that was material to the policy on the application, the policy is void. With respect to Count I, the motion for summary judgment should be granted.[21]

### Counts II-III: Negligence, Fraud and Deceit

In Count II, Plaintiff alleges that Union Security acted negligently when it failed to reject Martin's insurance application before his death, if the application was incorrect. In Count III, Plaintiff alleges a claim of fraud and deceit. Union Security argues that it had no duty to investigate whether Martin was telling the truth on his application; rather, Martin had a duty to be truthful. It further argues that Plaintiff has adduced no evidence to as to any of the elements required to maintain a claim for fraud and deceit. In addition, it contends that these tort claims are barred by the gist of the action doctrine. Because this latter argument is availing, the Court need not discuss Union Security's other arguments.[22]

### The Gist of the Action Doctrine

Under the gist of the action doctrine, "a claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social

---

[21] Plaintiff has asserted that Defendant has refused to return the premiums Martin paid. (Docket No. 15 ¶ 14.) Obviously, Union Security cannot void the policy and retain the premiums paid, and it should make arrangements to refund all premiums paid immediately.

[22] Plaintiff has not responded to any of these arguments.

policies embodied in the law of torts.'"  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001) (quoting Bash v. Bell Tel. Co., 601 A.2d 825, 830 (Pa. Super. 1992)).  Martin and Union Security were parties to a contract, namely the insurance policy, and their obligations are defined by that agreement, not the larger social policies embodied in the law of torts.  Thus, Plaintiff cannot maintain tort claims for negligence and fraud or deceit.  Brickman Group v. CGU Ins. Co., 865 A.2d 918, 927 (Pa. Super. 2004).  With respect to Counts II and III, the motion for summary judgment should be granted.

Count IV: UTPCPL Claims

In Count IV, Plaintiff alleges that Union Security violated the UTPCPL.  Specifically, she alleges that it violated the following provisions:

> Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

> Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

> Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding

73 P.S. § 201-2(4)(ii, vii, xxi).

Union Security contends that Plaintiff has not pleaded any specific facts in support of these claims, that she has not adduced evidence to support these claims, and that she has failed to plead and prove the elements of fraud as necessary to establish the catch-all provision under subpart xxi.  Plaintiff has not responded to these arguments.

The Court of Appeals has stated that "[i]n Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the [UTPCPL], and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a

contractual duty, is not actionable." <u>Horowitz v. Federal Kemper Life Assurance Co.</u>, 57 F.3d 300, 307 (3d Cir. 1995) (citations omitted).

In addition, as Union Security observes, Plaintiff has proffered no evidence to support UTPCPL claims under any of these subparts. Therefore, with respect to Count IV, the motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 11) be granted.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: September 16, 2008